UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLE LEWIS, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>CITY OF OAKLAND, et al.,<br><br>　　　　Defendants. | Case No. 24-cv-04096-SI<br><br>**ORDER DENYING PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 1 |

## BACKGROUND

On May 1, 2024, the Bay Conservation and Development Commission ("BCDC") sent a letter to the City of Oakland ("the City") alleging that the City was in violation of § 66632(a) of the McAteer-Petris Act because of an encampment of unhoused individuals at Toll Plaza Beach within the BCDC's 100-foot shoreline band jurisdiction. Dkt. No. 29-1 ("Duffey Decl.") Ex. B at 1. The letter indicated that the City had 35 days to resolve the violation before fines began to accrue. *Id.* On May 31, 2024, the City appealed the 35-day time limit for resolution of the violation, indicating that "there are currently not enough shelter options to close all encampments in high sensitivity locations" and the City's Encampment Management Team ("EMT") "anticipates having sufficient shelter capacity to fully enclose the encampment by July 19, 2024." *Id.* Ex. C.

According to the City, on May 3, 2024 its outreach contractor, Operation Dignity, "performed an initial site assessment and began engaging with encampment occupants." Duffey Decl. ¶ 8. According to the City, Operation Dignity returned on May 10, June 7, June 10, June 26, July 1, July 8, and July 9. *Id.* On June 26, 2024, Notices to Vacate the encampment were posted in four languages, indicating that the Public Works Department would clear and close the site on Tuesday July 9 through Thursday July 11, 2024. *Id.* Ex. D.

On July 5, 2024 attorney Andrea Henson sent the City a letter requesting postponement of the encampment closure to give disabled residents the time needed to find a safe place to live and store their possessions, modifications that are necessary to ensure any shelter offers are actually accessible to them, and modifications in the manner in which information is conveyed to them regarding the timetable for closure of the encampment and the assistance that is available to them. Dkt. No. 1, Ex. B.

On July 8, 2024, plaintiffs filed an ex-parte application for a TRO and preliminary injunction to halt eviction of residents at Toll Plaza Beach on July 9, 2024. Dkt. No. 1. On July 9, 2024, the Court held an initial hearing on plaintiffs' request for a TRO. The Court ordered the City to halt removal of vehicles, RVs, or other structures in which the plaintiffs live and to not disturb property the plaintiffs contend to be theirs; and ordered plaintiffs to speak with Operation Dignity representatives and fully disclose their disabilities to determine shelter options. Dkt. No. 13. On July 10, 2024, the Court extended the order halting eviction of plaintiffs through July 18, 2024 at 5:00 p.m. On July 16, 2024, the Court held a hearing on plaintiffs' request for an extension of the TRO and a preliminary injunction after full briefing by the parties. For the reasons set forth at the hearing and below, the Court hereby DENIES plaintiffs' request for further injunctive relief.

**LEGAL STANDARD**

Plaintiffs seeking a TRO or preliminary injunction must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit employs a "sliding scale test," which "allows a strong showing on the balance of hardships to compensate for a lesser showing on likelihood of success." *Where Do We Go Berkeley v. Cal. Dep't of Trans.*, 32 F.4th 852, 859 (9th Cir. 2022). "Thus, when plaintiffs establish that the balance of hardships tips sharply in their favor, there is a likelihood of irreparable injury, and the injunction is in the public interest, they need only show 'serious questions' on the merits." *Id.* (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).

2

**DISCUSSION**

**I.     ADA Claim**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  The implementing regulations require state agencies to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).  To state a prima facie case for a violation of Title II, plaintiffs must show that (1) they are "qualified individual[s] with disabilit[ies]"; (2) they were "either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or w[ere] otherwise discriminated against by the public entity"; and (3) "such exclusion, denial of benefits, or discrimination was by reason of [their] disabilit[ies]." *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, at 737-38 (quoting *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001)).  The parties' dispute centers on whether the City has provided reasonable accommodations under the ADA and whether the accommodations plaintiffs' request would require the City to fundamentally alter its programs.

Here, the program at issue is the City's Encampment Management Policy ("EMP").  The EMP designates areas as "high-sensitivity areas" where "unmanaged encampments are presumed to cause unreasonably high levels of health and safety impacts due to the nature of the location" or "low-sensitivity areas" where "enforcement will not be prioritized." Duffey Decl. Ex. A at 3.  Areas "[w]ithin 50 feet of a protected waterway as established by any governing body" are high-sensitivity areas.  *Id.* at 4.  When there is a closure intervention by the Encampment Management Team ("EMT"), "[a]ffected encamped individuals will be offered shelter and/or alternative housing (or, if located in a high-sensitivity area, and opportunity to voluntarily relocate to a low-sensitivity area)." *Id.* at 7.  "Encampments located within a high-sensitivity area that are not approved by the City Council will be subjected to a Closure intervention." *Id.* at 8.  Encampment residents will generally

3

1  "be given 72-hours to accept an offer of shelter or alternative housing if such referrals are available"
2  and "[e]mergency shelter provisions cannot be reserved for greater than 72-hours at a time." *Id.*
3  "The City cannot require any individual to accept any offered form of shelter and/or alternative
4  housing." *Id.* at 9.  Encampments in low-sensitivity areas that are in compliance with the standards
5  outlined in the EMP "are not subject to EMT intervention, unless an emergency arises." *Id.* at 8.  It
6  is not disputed that the Toll Beach Plaza encampment is within 50 feet of a protected waterway,
7  making it a "high-sensitivity area" under the City's EMP.

8         The ADA "requires only 'reasonable modifications' that would not fundamentally alter the
9  nature of the service provided, and only when the individual seeking modification is otherwise
10  eligible for the service."  *Tennessee v. Lane*, 541 U.S. 509, 532 (2004).  "An alteration is
11  fundamental if it would alter the 'essential nature' of the program." *Reed v. City of Emeryville*, 568
12  F. Supp. 3d 1029, 1043 (N.D. Cal. 2021) (citing *Alexander v. Choate*, 469 U.S. 287, 300 (1985).
13  Public entities "are not required to create new programs that provide heretofore unprovided services
14  to assist disabled persons." *Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003).  The
15  "determination of what constitutes a reasonable modification is highly fact-specific, requiring case-
16  by-case inquiry." *Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir. 1996).

17         Plaintiffs request that the Court "halt their eviction until the City is able to offer them
18  accommodations that actually meet their needs."  Dkt. No. 31 at ECF 2.  Plaintiffs request the
19  following specific accommodations that they contend would not require a fundamental alteration of
20  the EMP.  Mr. Sims requests another tire and gas card.  *Id.* at 6.  Robbie Simpson requests "the time
21  to find a safe place [to] live and continue to support his demented disabled father, without placing
22  them in an environment that is dangerous to his health and safety." *Id.*  Mr. Avery and Ms. Lewis
23  request a place in the community cabins where they could "live adjacent to each other and keep the
24  dogs they rely on for emotional support." *Id.*  Mr. Ernst requests the time to find a place to live that
25  would not "trigger his PTSD and anxiety and where he could keep the dogs that he relies on for his
26  emotional support." *Id.*

27         The City responds that it offers several temporary emergency shelter programs and that
28  based on current shelter ability, it endeavors to accommodate as many circumstances related to

4

disability as possible that do not "fundamentally alter" the City's temporary emergency shelter programs. Dkt. No. 29 at 6-7. The City contends that given its "efforts to work within the design of the City's emergency programs to accommodate as much as possible for these plaintiffs, there is no likelihood that plaintiffs will succeed on an ADA claim related to the City's failure to provide reasonable accommodations in its temporary emergency shelter sites." *Id.* at 7. According to the City, it "does not directly place individuals in long term or permanent housing." Duffey Decl. ¶ 11. "The process to receive these desired accommodations, is to accept an offer for 'services' which includes temporary emergency shelter." *Id.* The City "operates several temporary emergency shelter programs" including congregate, community cabins, RV parking, transitional housing, and specialized criteria shelters. *Id.* ¶ 12. "Intake for transitional housing and special criteria shelters are generally handled through Coordinated Entry System (CES) or a crisis assessment system, which the City does not control. Placement in long-term housing or transitional housing program is not guaranteed and if matched, intake can take up to two weeks." *Id.* ¶ 13.

    The Court finds that at this juncture, plaintiffs have not shown that they are likely to succeed on the merits or that there are serious questions on the merits of their ADA claim. At the July 16, 2024 hearing, the City represented that each plaintiff has been offered temporary shelter that accommodates their disabilities to the extent possible under the City's EMP given the City's limited resources and need to provide shelter for other unhoused individuals. The City has indicated that it will provide Matthew Sims with a fourth tire for his RV today. Michael Avery and Nicole Lewis have been offered a cabin together, or separate cabins, although the City cannot guarantee them separate cabins at the same site. While the Court understands that Mr. Avery and Ms. Lewis are caregivers for each other and is sympathetic to their request for separate cabins at the same site, the Court does not find that plaintiffs have made a sufficient showing that this is a reasonable accommodation given the City's resources and available shelter space. Frank Ernst has been offered a cabin space at Wood Street but indicates that he has been threatened by individuals who live at Wood Street so cannot accept a placement there. Robbie and David Simpson have been told the City has an RV space available as well as a cabin for one individual, and it may be possible to have two cabins available at Wood Street. The City has also indicated it can rearrange the available

5

shelter spaces to best accommodate the plaintiffs.  Given the City's ongoing efforts, the Court does not find that plaintiffs have raised a serious question that they were excluded from participation in or denied the benefits of the City's EMP or otherwise discriminated against by the City because of their disabilities.  *See Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, at 737-38.  While the Court understands plaintiffs' desire to preserve the community they have built, the Court cannot require the City to take actions that would fundamentally alter its EMP.  *See Where Do We Go Berkeley v. California Department of Transportation*, 32 F.4th 852 (9th Cir. 2022) (reversing a district court decision that had required Caltrans to give unhoused plaintiffs six months to relocate and find housing before clearing encampments, holding that "there is no serious question that the ADA requires such a lengthy delay").

Because the Court finds that plaintiffs have not raised serious questions on the merits of their ADA claim, the Court does not reach the issues of irreparable harm and whether an injunction would be in the public interest.

**B.     State-Created Danger Claim**

The Due Process Clause "does not 'impose a duty on the state to protect individuals from third parties.'"  *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019) (quoting *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007)).  But an exception to this rule is where the state "affirmatively places [a plaintiff] in danger by acting with deliberate indifference to a known or obvious danger." *Id.* (internal quotation marks omitted) (citing *Patel v. Kent. Sch. Dist.*, 648 F.3d 965, 971-72 (9th Cir. 2011)).  To succeed on a claim under the state-created danger doctrine, plaintiffs must establish, (1) "that the officers' affirmative actions created or exposed [them] to an actual, particularized danger that [they] would not otherwise have faced"; (2) "that the injury [they] suffered was foreseeable"; and (3) "that the officers were deliberately indifferent to the known danger." *Id.*

In their reply, plaintiffs frame the state created danger as the act of evicting plaintiffs "from the encampment where some of them have been living for years, and where they are for each other mutual support and find ways to accommodate each other's disabilities."  Dkt. No. 31 at ECF 6.

6

1    Plaintiffs contend that if the City breaks up this encampment without providing plaintiffs "genuine
2    accessible alternative places to shelter, Oakland will have created these dangers." Dkt. No. 31 at
3    ECF 7. In support of their state-created danger claim, plaintiffs point to a declaration from Dr.
4    Jeffrey Schonberg about the City's Community Cabins Program that was submitted with the parties'
5    status updates on July 10 as well as a declaration from Jessica Blalock, whose identity is unclear but
6    who lived at some point in the past in the City's Community Cabins Program. *See* Dkt. No. 16, 18.

7          This Court does not have the discretion to permit the Toll Beach Plaza encampment to
8    remain. The City appears to have followed its EMP in its decision to clear the encampment.
9    Although plaintiffs will no doubt be exposed to additional dangers once they lose the community
10   they have built for mutual support, the Court does not find that plaintiffs have made a showing at
11   this juncture that the City was deliberately indifferent to the dangers they would face upon leaving
12   their encampment. *See Reed v. City of Emeryville*, 568 F. Supp. 3d 1029, 1040 (N.D. Cal. 2021)
13   (finding that the fact that "a congregate shelter setting might have exacerbated the plaintiffs' mental
14   health impairments had any of the plaintiffs accepted the available shelter bed" does not mean that
15   the City placed plaintiffs in a more dangerous situation than living in their current encampment).

16         Because the Court finds that plaintiffs have not raised serious questions on the merits of their
17   state created danger claim, the Court does not reach the issues of irreparable harm and whether an
18   injunction would be in the public interest.

26   ///
27   ///

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby DENIES plaintiffs' request for an extension of the current TRO and for a preliminary injunction. The TRO previously entered will remain in effect through July 18, 2024 at 5:00 p.m. This means that the City is authorized to begin clearing the encampment on July 19, 2024 at 9:00 a.m. The City is ordered to continue working with these plaintiffs to ensure that they are offered the available shelter that best accommodates their disabilities prior to this time.

**IT IS SO ORDERED**.

Dated: July 16, 2024

_____
SUSAN ILLSTON
United States District Judge